[No. H003791. Sixth Dist. Nov. 16, 1989.]

NELSON R. DENNIS et al., Plaintiffs and Appellants, v.
COUNTY OF SANTA CLARA et al., Defendants and Appellants.

**COUNSEL**

Stephen A. Dennis, Thoits, Love, Hershberger & McLean for Plaintiffs and Appellants.

Donald L. Clark and Steven M. Woodside, County Counsel, Thomas Wm. Cain and Vanessa Ann Zecher, Deputy County Counsel, for Defendants and Appellants.

**OPINION**

**AGLIANO, P. J.**—Following plaintiffs' purchase of real property in San Jose, the Assessor of Santa Clara County revalued the property for tax purposes in an amount substantially higher than the purchase price. After the assessment appeals board denied plaintiffs' application for changed assessment, plaintiffs filed this action to nullify the board's decision. The superior court set aside the board's decision, finding that the full value of the property was the amount of plaintiffs' purchase price, and entered judgment accordingly. The County of Santa Clara and City of San Jose appeal. Plaintiffs cross-appeal with respect to attorney fees.

We conclude for the reasons stated below that the judgment must be reversed.

*Factual and Procedural Background*

In May 1982, plaintiffs purchased commercial real property at 3100 Alum Rock Avenue, San Jose, for $215,418 in cash. At the time, plaintiffs had an ownership interest in the corporation that was the major tenant on the property.

In June 1983, using the market data and income methods of appraisal, the assessor revalued the property for tax purposes at $334,600. (Rev. & Tax. Code, § 50.) Plaintiffs paid the tax on the newly assessed value, but applied to the board for changed assessment, claiming the assessor considered improper factors in his determination of value. (Rev. & Tax. Code, § 1603.) On the evidence presented, the board found the value of the property to be $334,600, as determined by the assessor under both the market data and income methods. The board noted: "The property was purchased directly from the owners, who were real estate brokers, and it was not listed on a multiple listing service at the time of sale."

Plaintiffs then filed a complaint in superior court for refund. The matter was submitted to the trial court on the administrative record and the parties' briefs.

In July 1985, the trial court remanded the matter to the board for further findings on the following questions: "1. The extent, if any, that the board considered the acquisition cost of the subject property, together with the reasons for rejecting same; [¶] 2. The comparable sales specifically relied upon, together with the nature and extent of all economic adjustments made to such comparable properties to account for difference between same and subject property; [¶] 3. The capitalization rate relied upon, together with the basis for the utilization of same; and [¶] 4. The sources utilized in determining the appropriate amount of economic rental income attributable to the subject property."

The board issued supplementary findings and conclusions in April 1986. Explaining its treatment of the purchase price, the board stated: "Subject property was purchased by the applicants in May, 1982 for $215,000. The applicant's primary contention in this appeal was that the sale of subject property to applicants was the only valid measure of the property's fair market value. [¶] At the time of the sale of subject property to applicants in May, 1982, the primary tenant was a corporation in which the applicants and their son were the shareholders. The corporation had a four year lease

on the property renewable on or before December 31, 1984 for an additional term. [¶] At the time the applicants purchased subject property it was not listed on a multiple listing service, and there was no evidence that it was offered for sale to any person other than applicants. The property was purchased directly from the former owners, and the applicants testified that the negotiated sales price was based in part on leases in existence at the time of purchase, which reflected rental rates which were below the market rates for the property. . . . [¶] The board finds that the purchase of subject property by the applicants in May, 1982 was an arms length transaction; however, the board further finds that when it is viewed in light of the comparable sales introduced by the Assessor and further viewed in light of the fact that it was purchased by an existing tenant without having been exposed for sale on the open market, it is not a sufficiently reliable indicator of the market value of subject property to form a basis for determining the full cash value of such property."

As to the market data relied upon, the board stated: "To support his conclusion of value derived from the use of the comparable sales approach, the Assessor introduced evidence of seven sales of properties located in the same or similar older retail and commercial areas. Comparables No. 1-3 were located in the immediate neighborhood of the subject property, and the remaining properties were located in areas with similar uses. Each of the comparables had retail uses, and Comparables No. 1, 4, and 5 had uses in addition to retail uses. The indicated values per square foot for Comparables No. 1, 2, 3, 5, and 6 were adjusted for the passage of time from the date of sale pursuant to a regressive analysis of sales prepared by the Standards Division of the Assessor's office. . . . Each of the seven sales introduced into evidence by the Assessor is sufficiently alike subject property as to shed light on the value of such property. The board finds that the adjustments for time made by the Assessor to Comparables No. 1, 2, 3, 5, and 6 were reasonable . . . ."

Referring to the capitalization of income approach, the board found the following: "The Assessor also introduced evidence of value based upon an income approach. . . . [¶] In arriving at value using the income approach, the Assessor used a capitalization rate of 11% based upon the property being an older property. This was higher than the rate used by the applicants (10%) in their income analysis. . . . [¶] Based on the Assessor's testimony as to the appropriate capitalization rate and as to the market rent for subject property, the board finds that the market value of subject property using an income approach to value is in excess of $334,600."

In determining what rental income would have represented reasonable economic yield for the property, "[t]he [Assessor's] appraiser testified that

the market for retail properties at the time of sale was 75¢ per square foot and that the market for shop/warehouse space was 30¢ per square foot. In determining the rental value of the office area, the appraiser used the asking price per square foot of subject property. No other evidence of comparable rentals was presented. . . . [¶] . . . The board further finds that the contract rents on subject property were below market rental rates and could not be used in an income approach to value."

The matter was again reviewed by the trial court, based on the record of the first trial, the board's supplemental findings, and additional briefs. On August 31, 1987, the court determined that the supplemental findings did not cure the defects in the original findings, "particularly with respect to the rejection of the purchase price, or acquisition cost, as an indicator of fair market value." The court admonished that "the substitution of the fact that the property was purchased by a tenant, in lieu of the lack of multiple listing, as a basis for rejecting the purchase price compounds the problem. This sale and purchase was an 'open market transaction' as a matter of law and the board is in error in rejecting it, or minimizing it, as a basis for determining full value. [¶] Moreover, the evidence presented at the hearing does not provide any substantial basis for the finding as to comparable sales or appropriate rent for the subject property. The properties compared are indeed significantly dissimilar . . . as evident from review of the transcript." The court concluded that "[u]nder all the circumstances, it is clear that the defects cannot be cured based upon the evidence presented at the hearing and that the only competent and substantial evidence is that the full cash value is $215,000."

The trial court awarded plaintiffs $1,500 in attorney fees.

Additional facts will be recited as they relate to the issues discussed below.

### Discussion

We confront two issues on appeal. First, we must determine whether the assessor was bound to adopt plaintiffs' purchase price as the fair market value of the property or whether he properly relied upon the market data and income methods of appraisal. Second, assuming that the assessor properly relied upon those methods, we must determine whether he properly applied the methods to this case.

### Standard of Review

Whether the valuation method used by an assessor is valid constitutes a question of law. The court must determine "whether the challenged

method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) Our review is de novo.

■ In reviewing the application of a valid valuation method, the trial court reviews the entire record to determine if the findings are supported by substantial evidence. (*Norby Lumber Co.* v. *County of Madera* (1988) 202 Cal.App.3d 1352, 1362 [249 Cal.Rptr. 646]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 176 [116 Cal.Rptr. 160].) A board of assessment appeals is " 'the sole judge of questions of fact and of the values of property.' " (*Id.* at p. 177.) As the court stated in *Bank of America* v. *Mundo* (1951) 37 Cal.2d 1, 5 [229 P.2d 345], "the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property."

Like the trial court, the appellate court may not independently weigh the evidence, but must apply the substantial evidence rule. (*A.F. Gilmore Co.* v. *County of Los Angeles* (1960) 186 Cal.App.2d 471, 477 [9 Cal.Rptr. 67] ■ [" '[T]he term "substantial evidence" should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision . . . .' [Citation.]"] (Italics in original.))

*Validity of Valuation Method*

Article XIII, section 1, subdivision (a), of the California Constitution provides that all property "shall be assessed at the same percentage of fair market value." "Fair market value" or "full cash value" is "the appraised value of real property when . . . a change in ownership has occurred after the 1975 assessment." (Cal. Const., art. XIIIA, § 2, subd. (a).) "Full cash value" is also statutorily defined as, "the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (Rev. & Tax. Code, § 110.)

■ The market data and income methods of assessing the fair market value of real property are traditional and well accepted. (See *Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at p. 1365; *Clayton* v. *County of Los Angeles* (1972) 26 Cal.App.3d 390, 392 [102 Cal.Rptr.

687].) But plaintiffs argue that, under the circumstances of this case, their purchase price was the only reliable measure of the property's value. At the same time, plaintiffs acknowledge that the purchase price resulted from the below market leases on the property.

As the trial court noted in its initial memorandum of decision, the assessor did not dispute the fact that the sale of the property to plaintiffs was an "arm's length transaction." In its second memorandum, the trial court concluded that the sale was an "open market transaction" as a matter of law.

We shall assume that the sale of the property to plaintiffs was indeed an arm's length, open market transaction. Therefore, although the sellers and plaintiffs were known to each other and had conducted business previously, we will assume that they negotiated the sale in the same manner as the sellers and a stranger might have done. More precisely, we will assume that the current leases on the property had the same impact on the transaction between the sellers and plaintiffs as they would have had on the sellers and any buyer. Thus, the sellers would have willingly accepted, and another buyer would have paid, approximately $215,000 for the property.

These assumptions lead us to the following question: In reassessing the fair market value after real property is sold in an arm's length, open market transaction, is the tax assessor bound by the purchase price agreed upon by the seller and buyer? According to the trial court's decision, the answer is yes. Although the trial court did not address the issue directly, the implication of the court's decision is that, in the event of an arm's length, open market sale, the purchase price *is* the fair market value and the assessor must adopt the purchase price as the reassessment figure. Had the court believed otherwise, presumably it would have remanded to the board for recalculation after determining that there was not substantial evidence to support the appraised value under the market data and income approaches. (See *Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at pp. 1363-1367; *Kaiser Center, Inc.* v. *County of Alameda* (1987) 189 Cal.App.3d 978, 983 [234 Cal.Rptr. 603], *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d at pp. 169-176.)

We disagree with the trial court. We conclude that the purchase price may play a significant role in the reassessment of property upon its sale but that the purchase price is only the beginning and not necessarily the end of the inquiry.

As provided by recently enacted section 110, subdivision (b), of the Revenue and Taxation Code, "For purposes of determining the 'full cash value'

or 'fair market value' of real property, other than possessory interests, being appraised upon a purchase, 'full cash value' or 'fair market value' shall be the purchase price paid in the transaction unless it is established by a *preponderance of the evidence* that the real property would not have transferred for that purchase price in an open market transaction. The purchase price shall, however, be *rebuttably presumed* to be the 'full cash value' or 'fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other. . . ." (Italics added.)

■ As we interpret the statute, an arm's length, open market sale for a price that is not influenced by an exigency of either buyer or seller permits the assessor to presume fair market value from the purchase price, but the presumption may nevertheless be rebutted by evidence that the fair market value of the property is otherwise.

■ Prior case law is in accord. "[W]hile a recent, open market, arm's length sale of a particular type of property may be a very important factor in determining its fair market value, the sale, by itself, does not provide sufficient, reliable data to enable the assessor to make an accurate valuation of that property [citation]; it is only a starting point in appraising the property." (*Guild Wineries & Distilleries* v. *County of Fresno* (1975) 51 Cal.App.3d 182, 187 [124 Cal.Rptr. 96].)

California courts have recognized that even an arm's length, open market transaction may involve factors that skew the purchase price and make it an unreliable indicator of the fair market value. " ' "In any single individual transaction there are many variables which are dependent upon the peculiar aspects of the transfer and which affect the price agreed upon by the parties. Market value, therefore, is generally established by numerous sales of the same or comparable property and, although the price paid for property may be admissible to prove its market value, that fact alone is not conclusive." ' " (*Guild Wineries & Distilleries* v. *County of Fresno, supra,* 51 Cal.App.3d at pp. 187-188, quoting from *Gillingham* v. *Stadler* (1970) 93 Idaho 874 [477 P.2d 497, 501].)

Such variables may take many forms: For example, the property may be of a kind seldom exchanged. Or the transaction may be complex, comprising several components in one package. Or the purchase price may be influenced by tax consequences and other business considerations that affect the value ascribed to the property by the particular buyer and seller. (*Guild Wineries & Distilleries* v. *County of Fresno, supra,* 51 Cal.App.3d at pp. 187-189.) Or, as in *Carlson* v. *Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004 [213 Cal.Rptr. 555], the parties' agreement may contain restrictions

on the buyer's use of the property, thus resulting in a reduced purchase price.

In *Carlson,* an agreement for the sale of property included a requirement that the buyer construct a warehouse on the property, contract with the seller's parent company for rail service to the warehouse, and grant a railroad easement to the parent company. If the buyer failed to perform, the seller could repurchase the property at the buyer's purchase price. The assessor refused to give effect to the restrictions in the parties' agreement and valued the property at more than triple the purchase price. The assessment appeals board concluded that the assessor erred in not giving effect to the contract restrictions and lowered the assessment accordingly. We reversed, holding that the privately imposed restrictions resulted in a "distorted notion of value." (*Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d at p. 1013.) The restrictions constituted a variable that could not bind the assessor.

The instant case involves at least two potential variables: the relationship between the sellers and plaintiffs (landlord-tenant) and the fact that the subject property was generating rent at well below market for comparable property. While plaintiffs assert that the parties' relationship had no bearing on the purchase price, plaintiffs acknowledge that the low rents generated the low price. Plaintiffs insist that the assessor must give effect to this low rent variable.

We believe that this issue was correctly decided in *Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d 390, in which property was improved with a department store leased for 30 years, with a 60-year renewal option, at well below market. Disregarding the actual rental income, the assessor valued the property based on the "economic rental"—that is, the current value of the rental property on the open market. The Court of Appeal framed the issue thusly: "[I]n determining the 'full cash value' [citation] of plaintiffs' fee interest in the real property, should the appraiser take into account the 'economic rental' [citation], even if—as here—the actual rental income from the property was below the economic rental? Put differently the question is whether because plaintiffs made a bad lease . . . , the property must be assessed at a lower figure than would be appropriate if they had not given up their right to possession or had negotiated for the going rent." (*Id.* at p. 392.) Stating the issue yet again, in an even more abbreviated and pragmatic fashion, the court asked "whether an owner who does not 'command the full potential of his property [can] expect his fellow taxpayers to compensate him for the difference.'" (*Id.* at p. 392, fn. 3, quoting from *Petition of Ernst* (1968) 58 Misc.2d 504, 505 [295 N.Y.S.2d 712, 715].) The court upheld the assessor's valuation based on the economic rent.

The consistent line of cases concerning the myriad variables that may arise in real property transactions reflects a fundamental principle underlying the tax assessment system. ██ "[R]egardless of the specific conditions affecting the value of the property to the individual owner, the assessment method for property tax purposes must be objective." (*Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d at p. 1011; see also *Trabue Pittman Corp.* v. *County of L.A.* (1946) 29 Cal.2d 385, 392 [175 P.2d 512] ["For the most part, assessors must be allowed to act on the basis of outward appearances."].) The cases rely upon *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 566 [290 P.2d 544], in which the Supreme Court noted: "The present owner may have invested well or poorly, may have contracted to pay very high or very low rent, and may have built expensive improvements or none at all. . . . [S]ince . . . the legislative standard of value is 'full cash value,' it is clear that whatever may be the rationale of the property tax, it is not the profitableness of property to its present owner."

In each of these cases, the fair market value calculated by the assessor equals the sum total of interests in the property, although such interests may not be wholly reflected in the purchase price or in the actual income from the property. In *De Luz,* which involved the assessment of a possessory interest of a lessee, the court observed: "In practice, assessors usually enter the entire value of land and improvements on the tax roll without distinction between possessory and reversionary interests, and since this practice results in a single amount reflecting both interests on the roll, the constitutional mandate that all property be taxed is obeyed. [Citation.] As between reversioners and possessors payment of the tax is a private arrangement. [Citations.]" (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 563.) Thus, the assessor's valuation equals the sum total of all parties' interests in the property although the tax bill is sent to just one party.

Similarly, in *Carlson,* the assessment reflected the interest not only of the buyer of the property but also of the seller's parent company, which retained a valuable interest as a result of the contractual restrictions. The combination of interests constituted the fair market value of the property. Likewise, in *Clayton,* the assessment reflected the interest not only of the owner of the property but also of the entity renting the department store facility at well below market. The *Clayton* court noted the "bonus value" of the lease to the lessee. (*Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d at p. 393.)

██ In the instant case, the assessment represents the value of the property to plaintiffs as well as the "bonus value" of the below market leases to plaintiffs' lessees. The assessor properly looked beyond the

purchase price that reflected the below market leases and relied upon well-accepted methods of valuation. In setting aside the board's decision, the trial court erred by binding the assessor to the purchase price paid by plaintiffs in a concededly arm's length, open market transaction, despite the existence of a variable that skewed the purchase price.

*Application of Valuation Method*

 The record contains substantial evidence to support the board's finding of value based on the market data method of valuation.

"In estimating value . . . the assessor shall consider one or more of the following, as may be appropriate for the property being appraised: [¶] (a) The price or prices at which the property and comparable properties have recently sold (the comparative sales approach)." (18 Cal. Code Regs., § 3.) "[M]arket data on recent sales of the property to be assessed and comparable properties, when such data is available, is the most accurate way of arriving at the assessed value of the property. [Citations.]" (*Guild Wineries & Distilleries* v. *County of Fresno, supra,* 51 Cal.App.3d at p. 187.)

"When valuing property by comparison with sales of other properties, in order to be considered comparable, the sales shall be sufficiently near in time to the valuation date, and the properties sold shall be sufficiently near the property being valued, and shall be sufficiently alike in respect to character, size, situation, usability, zoning . . . to make it clear that the properties sold and the properties being valued are comparable in value and that the cash equivalent price realized for the properties sold may fairly be considered as shedding light on the value of the property being valued." (Rev. & Tax. Code, § 402.5.)

The subject property consisted of 14,500 square feet of land and 7,810 square feet of improvements housing a retail store, medical/dental offices, and a warehouse. Jack LaCorte, defendants' appraiser, stated that the $215,000 selling price converted to $27.52/square foot. Since this figure appeared low, he investigated further. He examined sales of seven other commercial properties, which, like the subject property, were older properties. All sales were close in time to the valuation date of the subject property; LaCorte adjusted the purchase prices to reflect the passage of time.

Comparable number one contained Mr. Hubcap, a retail store, and an apartment. It was located directly across the street from the subject property and sold for $60.35/square foot. Comparable number two contained Alliance TV and was on the same street as subject property. This property was inferior to the subject property in construction and location, yet it sold for $60.15/square foot. Comparable number three housed a liquor store and a Kirby Vacuum Cleaner store and was also on the same street as the

subject property. It sold for $65.89/square foot. Comparable number four contained a retail store, a duplex, and a cottage. It was in poor condition and not located in a central business area. In November 1979 and December 1982, it sold for $59/square foot and $84.75/square foot respectively. Comparable number five was a grocery store and cottage located in a noncommercial area five miles from the subject property. It sold for $57.95/square foot. Comparable number six contained a dry cleaning establishment and a vacant space. This property was located in a commercial area, distant from the subject property. It sold for $55.92/square foot. Comparable number seven, housing a thrift shop, sold for $57.91 square foot.

LaCorte stated that, based on the foregoing comparable sales, he valued the retail area of the subject property at $60/square foot, yielding a partial value of $250,800. He then assigned the office area a price of $45/square foot and the warehouse $30/square foot, thus adding $139,200. Considering the purchase price of the subject property as well as the prices of the comparable properties, however, the assessor appraised the subject property conservatively at $42.84/square foot. In our view, the evidence substantially supports the board's findings that the properties offered as comparable sales were sufficiently similar to plaintiffs' property so as to shed light on the subject and the board's ultimate finding that the value of the subject property was $334,600—not its selling price of $215,418.

Plaintiffs presented evidence of a comparable sale that tended to support a lower value. The Purple Heart Thrift Store, smaller than the subject property, sold in April 1981 for $95,000. But this evidence did not necessarily negate the probative value of the other comparable sales and, as previously noted, neither this court nor the superior court may reweigh the evidence where a taxpayer is challenging the factual determinations of the board. (*Bank of America* v. *Mundo, supra,* 37 Cal.2d at p. 5.)

 Plaintiffs argue that the assessor did not adjust for differences between the subject property and the comparable sales properties. Plaintiffs point out, for example, that the subject property was much larger than the comparable sales properties. But the selling prices of all properties were calculated on a square footage basis, which would naturally give effect to size, and there is no evidence that disparity in the sizes of the subject and comparable sales properties would generate a significant difference in the price per square foot. Indeed, the comparable sales properties appear inferior to the subject property, so that any further adjustment would have been to plaintiffs' disadvantage.

Plaintiffs also argue that the comparable sales evidence is not relevant because those properties were generating rents at market levels, while the

subject property rents were well below market. This fact does not assist plaintiffs, however, "In valuing property encumbered by a lease, the net income to be capitalized is the amount the property would yield were it not so encumbered, whether this amount exceeds or falls short of the contract rent and whether the lessor or the lessee has agreed to pay the property tax." (Cal. Code Regs., tit. 18, § 8, subd. (d); see also *Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d at p. 396.) The board correctly determined the lower than market rents could not be considered a determiner of value under the capitalization of income method. It follows that the low lease rents should not be considered in the market data approach either, except to minimize the weight to be accorded the selling price in the board's search for the property's fair market value.

The evidence also established value by capitalizing hypothetical market income. The resulting value was consistent with and even exceeded that reached under the comparable sales method. However, since the income method "is the preferred approach for the appraisal of land when reliable sales data for comparable properties are not available" (Cal. Code Regs., tit. 18, § 8, subd. (a)), we need not review this evidence further.

### Disposition

The judgment is reversed with direction that judgment be entered in favor of defendants. This reversal does not affect the trial court's award of attorney's fees since it appears such fees were incurred in connection with the initial remand to the board and plaintiffs were entitled to such fees pursuant to the provisions of Revenue and Taxation Code section 1611.6. Costs to defendants.

Cottle, J., and Fogel, J.,* concurred.

A petition for a rehearing was denied December 15, 1989, and the petition of plaintiffs and appellants for review by the Supreme Court was denied March 15, 1990. Lucas, C. J., and Panelli, J., were of the opinion that the petition should be granted.

.

---

* Assigned by the Chairperson of the Judicial Council.