**JACK BURTON MANAGEMENT CO., Plaintiff,**

v.

**AMERICAN NATIONAL INSURANCE CO., Defendant.**

**No. 4:98CV1271–DJS.**

United States District Court, E.D. Missouri, Eastern Division.

Dec. 17, 1999.

Thomas P. Hohenstein, Harold S. Goodman, Gallop and Johnson, St. Louis, MO, for Plaintiff.

Byron E. Francis, Armstrong Teasdale, LLP, St. Louis, MO, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

STOHR, District Judge.

In this diversity action, plaintiff, a lessee of real property, seeks damages from defendant for breach of a long-term sublease. By its order and partial judgment of August 27, 1999, the Court granted plaintiff

partial summary judgment as to liability on Counts I and III of the first amended complaint. The parties waived trial by jury in their joint filing of September 16, 1999, and the Court, sitting without a jury, tried the damages issues on September 28, 1999. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

### Findings of Fact

1. Plaintiff is the lessee of a paved lot located at 1118, 1120 and 1122 Olive Boulevard in the City of St. Louis ("the property") for a 99–year term commencing June 10, 1954.

2. On November 22, 1968, plaintiff subleased the property for a term of 40 years to Gilroy, Sims & Associates ("Gilroy"), which constructed and owned a building adjacent to the property at 210 N. Tucker. The sublease obligated Gilroy to pay plaintiff rent, pay the real estate taxes on the property, maintain property and liability insurance, and maintain and repair the property.

3. As of May 7, 1991, defendant acquired Gilroy's leasehold interest by way of foreclosure on a defaulted loan. From 1991 through January 1998, defendant performed under the sublease. After selling the building next door at 210 N. Tucker in November 1997, defendant claimed it had no further obligation under the "month to month" lease of the property.

4. Until the sublease in 1968, the property was used as a parking lot.

5. Because the adjacent 210 N. Tucker building then owned by the sublessee houses a United States Post Office, the property has been used during Gilroy's and defendant's leaseholds as a staging area for postal trucks.

6. The property is 57 feet wide, fronting on Olive Boulevard to the north, and 109 feet deep, with an alley running along the lot on the south side.

7. If operated as a parking lot, the property could maximally accommodate 24 cars. Even at that level of operation, the lot would not generate enough revenue to reasonably support the employment of an attendant. Taking into account the rental rates at comparable lots in the property's vicinity, currently a gross rental of $70.00 per month per car represents the fair market rental obtainable from the lot if operated in this manner. At this rental rate, maximal capacity would yield gross annual income of $20,160.00.

8. The lease provides that the monthly rent be recalculated every three years pursuant to a formula based on the Consumer Price Index. The parties agree that application of that formula with the assumption of a 1½% annual increase in the CPI adequately approximates the projected recalculations of the rent over the remaining term of the sublease through 2008.

9. The parties similarly agree that an assumption of annual 1 ½% increases can be used to adequately approximate the projected real property taxes on the property over the remaining term.

10. For 1998 and 1999, the monthly rent under the lease is $5,211.08. The eleven months' rent owed for February through December 1998 plus the nine months' rent owed for January through September 1999 totals $104,221.60.

11. The present value of future rentals under the lease, from October 1999 through December 2008, is $359,925.98, applying a discount rate of 5.285%. This calculation includes off-sets for the reasonable annual rental value of $20,160.00, and projected annual increases of 1½% in the CPI.

12. Defendant has paid the real estate taxes for the property through tax year 1998. The present value of future real property taxes on the property through the term of the lease, beginning with 1999, is $51,046.38, applying the same discount rate of 5.285%. This calculation takes into

account projected annual tax increases of 1 ½%.

### Discussion and Conclusions of Law

■ The Court and parties are in agreement that Missouri law governs this action, and more specifically that *Hawkinson v. Johnston*, 122 F.2d 724 (8th Cir.1941), and *Adkins v. Hobson & Son, Inc.*, 666 S.W.2d 951 (Mo.App.1984), provide the measure of damages for rent due based on an anticipatory breach of a lease. Under these authorities, plaintiff is entitled to recover the rent due through the end of the sublease term, less the reasonable rental value of the property for that period, discounted to present value.[1]

■ The parties disagree, simply put, on the point in time which separates the past from the future for purposes of damages calculation. In the Court's view, the time of trial separates the past and present for this purpose. At the time of trial, historical evidence presumably can be adduced as to all past damages actually incurred to that point. The future—and the need for approximation and reduction to present value which accompany it—begins thereafter. Considering the September 28 trial date but also the monthly nature of the rental payments which constitute the principal species of damages in this case, the Court uses October 1, 1999 as the dividing line between past and future.

The two more significant disputes between the parties are the property's fair rental value and the appropriate discount rate to be used in determining present value. The first is almost entirely an issue of fact, as to which the Court's determination is set out in the findings of fact. The Court here comments only to note that it found more persuasive the approach of plaintiff's valuation expert, who arrived at a fair market rental by surveying comparable parking lots and rates in proximity to the lot here at issue. By contrast, defendant's expert estimated the fair rental value at a percentage of the fair market value of the property itself, opining that a reasonable real estate investor would expect that rate of return on the property. This approach fails in the Court's view to take into account actual prevailing market conditions and the probable limited use of the property as a parking lot.

As to determination of the appropriate discount rate, plaintiff relies upon two cases of United States Bankruptcy Courts, in which the courts applied the federal post-judgment interest rate. *S.P. Investments Limited Partnership v. O'Connor*, 145 B.R. 883, 894 (Bkrtcy.W.D.Mich.1992); *United American Financial Corporation v. Knoxville Properties, Inc.*, 55 B.R. 117, 119 (Bkrtcy.E.D.Tenn.1985). Both of these cases present determinations highly analogous to the instant case, involving the present value of rental payments over the remaining term of a lease.

Defendant cites *Hutton v. Essex Group, Inc.*, 885 F.Supp. 331, 334 (D.N.H.1994), in which the district court held that the plaintiff in a wrongful termination case had the burden of coming forward with evidence "of the proper rate of discounting" for calculation of the present value of lost future earnings. There the court's larger concern was that the plaintiff's evidence be sufficient "to allow the jury rationally to reduce her lost future earnings to their [present] value." *Id.* at 335. In the Court's view, this case fails to speak to the determination of the correct discount rate in this case.

Defendant also cites *Admae Enterprises, Ltd. v. 1000 Northern Blvd. Corp.*, 104 A.D.2d 919, 480 N.Y.S.2d 537 (N.Y.App. Div.1984), in which a New York state appellate court accepts as reasonable a discount rate of 10%, a rate employed in the plaintiff's expert's testimony and not ob-

---

1. If a longer period of time remained on the lease, such as in *Hawkinson* 67 of 99 years, the future damages might be limited to a shorter period of time, e.g., ten years. *Hawkinson*, 122 F.2d at 727, 730–31. Here, where the time remaining under the lease as of repudiation is approximately ten years, the parties appear agreed that the damage calculation can be based on that actual period of time.

jected to by the defendant. In its historical context, this determination is hardly relevant to a determination of a reasonable discount rate today, and may actually support the proposition that the federal post-judgment rate is a reasonable discount rate. At the time of the New York court's *Admae* decision on October 15, 1984, the federal rate was 11.36%. Defendant here urges application of an 11% discount rate, although the federal rate at the time of trial on September 28, 1999 was only 5.285%.

Defendant also cites other cases in which a New York bankruptcy court and a California state court have used or affirmed the use of discount rates of 9% to 12%. *In re Andover Togs, Inc.,* 231 B.R. 521, 534 (Bankr.S.D.N.Y.1999); *American Sheds, Inc. v. County of Los Angeles,* 66 Cal.App.4th 384, 397–98, 78 Cal.Rptr.2d 58 (1998). In *Andover Togs,* 231 B.R. at 534, the rate was supported by very specialized expert testimony that the "discount rate as of May 1996 for a midtown [Manhattan] office ranged from 9 to 18 percent, with the reported average being 11.9 percent." In *American Sheds,* 66 Cal.App.4th at 397, 78 Cal.Rptr.2d 58, the appellate court affirmed a county tax assessment board's application of a 12% discount rate, where the taxpayer had "urged rates of 33 percent, or 18–20.6 percent." The particular circumstances of these cases, which support their determinations as to higher discount rates, are not particularly persuasive in the context of the case at bar.

■ More persuasive to the Court is the approach of the Supreme Court tending toward a more conservative discount rate. In *Jones & Laughlin Steel Corporation v. Pfeifer,* 462 U.S. 523, 536–37, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), the Supreme Court discussed selection of an appropriate discount rate in the context of the present value of an injured longshoreman's future lost wages:

**2.** The Eighth Circuit has affirmed a district court's reliance upon *Pfeifer* in a South Dakota personal injury case requiring computation of the present value of future economic dam-

It has been settled since our decision in *Chesapeake & Ohio R. Co. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 ... (1916) that "in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award." *Id.* at 490, 36 S.Ct. 630 ... The discount rate should be based on the rate of interest that would be earned on "the best and safest investments." *Id.* at 491, 36 S.Ct. 630 ... Once it is assumed that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default.

Following this rationale in the instant case, the future term of payments being fixed by the sublease, plaintiff is entitled to a risk-free stream of future income to replace its lost rent.[2] Citing *Chesapeake & Ohio,* one commentator has explained the same rationale in the following plain and helpful language:

The federal courts ... attempt to fix a rate at which an ordinary person can invest safely without any special skill. Investments that are both safe and require little skill generally return less than more risky investments, and since there is no reason to burden the plaintiff with a risky investment, a rather low (and safe) interest rate is usually assumed. Indeed it is often lower than relatively safe savings account interest, since over the loss period the interest rates may fluctuate and it is usually thought that the defendant should take the risk of this fluctuation rather than the plaintiff. Thus courts have often assumed quite low interest rates in computing present worth.

ages. *Robichaud v. Theis,* 858 F.2d 392, 396 (8th Cir.1988). Like Missouri, South Dakota has not addressed the appropriate discount rate in statute.

**1110**

Dan B. Dobbs, *Handbook on the Law of Remedies* § 8.7, p. 571 (1973).

This view coincides with plaintiff's proffered methodology, employed in the highly analogous bankruptcy court opinions plaintiff cites, of using the federal post-judgment interest rate. That rate, set by statute at 28 U.S.C. § 1961, is "a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." Such a rate meets the objective of *Pfeifer* to provide the plaintiff with a present sum from which the lost future income stream may be derived with a minimum of risk. The Court therefore uses 5.285%—the federal statutory post-judgment rate in effect at the time of trial on September 28, 1999— as the discount rate for computing present value in this case. The Court having determined the reasonable rental value of the property in accordance with plaintiff's evidence on this issue, the computation of the present value of plaintiff's damages for lost rent is set forth in plaintiff's actuarial expert's testimony and in one of her reports. *See* Pltf.Exh. 23.

 Neither the Court's partial summary judgment order nor the parties' briefs address the proper calculation of the other species of damages sought by plaintiff, namely taxes. On this issue as well the Court is guided by *Hawkinson*, 122 F.2d at 727, which affirmed an award of a "sum equal to the taxes which the lessees with reasonable certainty would have been required to pay during [the damages period], similarly commuted to its present value." In determining this amount, the trial court had before it evidence of "the taxes assessed against the property for the preceding eight years" and evidence of "community conditions and locational situation." *Id.* at 730. Here, the parties have expressed agreement upon projected 1½% annual increases in the property tax assessment. Using this assumption, plaintiff's expert testimony supports the Court's finding that the present value of the real property taxes owing for tax years 1999 through 2008 is $51,046.38.

Plaintiff's first amended complaint is pled in three counts. Count I asserts defendant's breach of the sublease and seeks recovery of the rents owing through November 1998, the date of the filing of the first amended complaint. The Court characterizes Count I as seeking past damages for defendant's breach. Count II, seeking recovery on a duplicative theory, was voluntarily dismissed by plaintiff at the time of trial. Count III asserts defendant's anticipatory breach, and seeks future damages for the remaining term of the sublease. In keeping with the Court's findings of fact and conclusions of law, the Court will enter judgment on Count I in the amount of $104,221.60, representing the past due rents owed under the sublease to October 1, 1999, and will enter judgment on Count III in the amount of $410,972.36, representing the present value of the lost future rent and tax payments due through the remainder of the sublease term. The Court will here deny defendant's oral motion, made at trial, for judgment as a matter of law, and will also deny plaintiff's motion to bar the testimony and report of defendant's expert, Edward Dinan.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to bar testimony from defendant's expert, Edward D. Dinan, and the introduction into evidence of defendant's Exhibit A [Doc. # 43] is denied.

**IT IS FURTHER ORDERED** that defendant's oral motion, made at trial, for judgment as a matter of law is denied.