[No. H004193. Sixth Dist. Aug. 31, 1990.]

FIRESTONE TIRE AND RUBBER COMPANY, Plaintiff and Appellant, v.
COUNTY OF MONTEREY, Defendant and Appellant.

COUNSEL

Ehrman, Flavin, Devine & Baker, Flavin & Baker and Paul W. Baker for Plaintiff and Appellant.

Ralph R. Kuchler, County Counsel, and Diane C. Popowski, Deputy County Counsel, for Defendant and Appellant.

OPINION

ELIA, J.—Appellant Firestone Tire and Rubber Company (Firestone) appeals a judgment which in part, upholds the assessor's valuation of its Salinas plant for the 1980 tax year. We will affirm that part of the judgment.

We also determine in this case that where the cost of pollution cleanup reduces the fair market value of property, it may form the basis for a reduction in that property's assessed valuation. Since the trial court's conclusion that Firestone was entitled to such a reduction in valuation for the 1980 tax year is not supported by substantial evidence, however, we will reverse that part of the judgment ordering the cause remanded to Monterey County's Assessment Appeals Board (board) for the purpose of determining the appropriate reduction in the fair market value of the property which was due to the cost of toxic waste cleanup.

FACTUAL AND PROCEDURAL BACKGROUND

Firestone owns a tire manufacturing and storage facility near Salinas which was built in 1963. Its size is almost 2 million square feet. On March 18, 1980, Firestone's board of directors voted to close the plant. This decision was publicly announced the following day, and the plant actually terminated operations about six months later.

On March 1, 1980, respondent Monterey County's assessor valued Firestone's property based on its use as an operating industrial facility. An assessment based on this valuation was entered on the secured assessment roll on June 2, 1980. Firestone appealed this assessment, and the case was heard before the board in April 1984. At this hearing, Firestone argued that the assessor should have been aware of the many tire plant closures in the United States between 1973 and 1980, and that other factors affecting the tire industry, including the move to radial from bias-ply tires, and the drastic decline in tire consumption, should have alerted the assessor to the

possibility that the facility would not remain in operation. It argued that the highest and best use of the property was for the machinery and equipment to be liquidated, for the real property to be subdivided for other uses, and for the assessment to be based on these uses.

The board found that the assessor had no actual or constructive notice, as of the assessment date, March 1, 1980, that the plant would be closing during the 1980-1981 tax year. It also found that during the three preceding years, appellant had spent almost $10 million, or 17.8 percent of the plant total, for new manufacturing equipment.

Appellant also argued at this hearing that the cost of hazardous waste cleanup at the site should be deducted from the property value for property tax purposes. Apparently the California Department of Health Services (DHS) identified health hazards at the plant on December 24, 1981, but the contamination was not made public until 1983. It is undisputed that the county assessor's office did not know of the pollution on the assessment date, March 1, 1980.

Contamination on the site included asbestos in the building, and soil and groundwater contamination. According to appellant's attorney, the contamination "occurred over a period of years beginning in 1964 as the product of a number of spillages of chemical materials and it was a gradual accumulation. The well tests, of which there have been hundreds, show that the contamination has percolated, that the percolation rates established that it has been a long continuing event."

The cost of cleaning up the toxic waste pollution, at that time, was estimated to be over $5½ million.

DHS apparently informed appellant that it would not be allowed to sell the property, and that no one would be able to put it to any other use until there had been an "environmental clean bill of health issued with respect to the site."

The board upheld the property tax valuation, but rejected Firestone's argument that the cleanup costs could provide the basis for reducing its assessment.

Firestone then filed a complaint for the recovery of taxes, pursuant to Revenue and Taxation Code section 5140. A hearing on the issues was held on July 14, 1987. In its statement of decision, the trial court determined that

substantial evidence supported the 1980 property tax valuation but not the board's finding regarding toxic cleanup costs. It therefore remanded the matter to the board to determine what reduction in the property's value reflected these costs.

Firestone appealed that part of the judgment affirming the 1980 property tax valuation. Monterey County cross-appealed from that part of the judgment which remanded for a reduction in this assessment to reflect pollution cleanup costs.

A. Property Tax Valuation

Firestone first disputes the trial court's affirmance of the assessor's valuation of its property for the 1980 tax year. Since the parties disagree on the applicable standard of review, we will first clarify how this court will review that decision.

County boards of equalization are created by article XIII, section 16 (former section 9) of the California Constitution to equalize the valuation of taxable property within their jurisdiction. Article XIII, section 16 (former section 9.5) authorizes county boards of supervisors to create assessment appeals boards to function as boards of equalization. (See *Norby Lumber Co.* v. *County of Madera* (1988) 202 Cal.App.3d 1352, 1362 [249 Cal.Rptr. 646]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 168 [116 Cal.Rptr. 160].)

■ " 'The law presumes that assessment officers have properly performed their duties and consequently that assessments are regularly and correctly made. [Citations.]' " (*County of Los Angeles* v. *McDonnell Douglas Corp.* (1990) 219 Cal.App.3d 715, 721 [268 Cal.Rptr. 294], quoting *Dressler* v. *County of Alpine* (1976) 64 Cal.App.3d 557, 566 [134 Cal.Rptr. 554].)

■ Trial court review of such a board's decision must determine both whether the board's findings are supported by substantial evidence, and whether it has committed any errors of law. (*Hunt-Wesson Foods, Inc.* v. County of Alameda, *supra,* 41 Cal.App.3d at p. 178; *Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at p. 1365; *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 555 [195 Cal.Rptr. 895].) ■ The method of valuation presents a legal issue subject to judicial review. (*Ibid.; Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1025 [263 Cal.Rptr. 887].) When faced with a challenge to a valuation method, a trial court must determine whether it is " 'arbitrary, in excess of discretion, or in violation of the standards prescribed by

law.'" (*Id.* at p. 1026, quoting *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) An appellate court reviews this decision de novo. (*Dennis* v. *County of Santa Clara, supra*, 215 Cal.App.3d at p. 1026.)

When reviewing a particular method's application, the trial court reviews the entire record to determine if the board's findings are supported by substantial evidence. (*Dennis* v. *County of Santa Clara, supra*, 215 Cal.App.3d at p. 1026; *Norby Lumber Co.* v. *County of Madera, supra*, 202 Cal.App.3d at p. 1362; *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra*, 41 Cal.App.3d at p. 176.) Our role is identical to that of the trial court. We "may not independently weigh the evidence, but must apply the substantial evidence rule." (*Dennis* v. *County of Santa Clara, supra*, 215 Cal.App.3d at p. 1026.) This court recently defined substantial evidence, in *Dennis,* as a term which "should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision." (*Id.* at p. 1026, quoting *A. F. Gilmore Co.* v. *County of Los Angeles* (1960) 186 Cal.App.2d 471, 477 [9 Cal.Rptr. 67], italics in original, internal quotation marks omitted; *County of Los Angeles* v. *McDonnell Douglas Corp., supra*, 219 Cal.App.3d at p. 722.)

Having clarified the applicable standard of review, we turn to Firestone's argument. It complains that the board should have considered evidence that the plant was not economically viable as a tire manufacturing facility on the assessment date, and should not have been valued as such. It contends the board determined that the expert opinions Firestone proffered on this subject were irrelevant because the assessor had no knowledge of the possibility that the plant would close. It argues it was entitled to present independent evidence of the property's value regardless of what the assessor knew or should have known on March 1, 1980.

Respondent counters that the assessor correctly valued the facility as a tire manufacturing plant according to the "replacement cost" method of valuation, and notes that Firestone did not challenge this valuation method.

The board found the assessor was not required to consider information it obtained after the March 1st lien date but before the actual placement of the valuation on the tax roll on June 2. It also found the assessor was not chargeable with the knowledge of an expert willing buyer in computing the value of Firestone's "large, unique and complicated parcel of industrial property." It went on to condone the replacement cost method used by the

assessor to compute the plant's value as reasonable, and upheld the original assessment.

At the trial court level, Firestone claimed it was "denied due process of law" by the board's failure to consider evidence that the plant should not be valued as a tire manufacturing facility. The trial court noted, however, that Firestone "acknowledges that the [b]oard did not exclude any relevant evidence at the hearing itself regarding plaintiff's proposed methods of valuation." The board had heard the testimony of Firestone's witnesses regarding the economics of the tire industry, the court noted, and it construed Firestone's argument as referring to the board's refusal to " 'impute' to the [a]ssessor, as of the March 1st lien date, certain 'knowledge' known only to plaintiff and 'knowledgeable buyers' on that date." The trial court concluded this was a distortion of the board's findings, and that the board had in fact considered and weighed Firestone's evidence, and had "adopted the [a]ssessor's method of valuation and evidence supporting it as a more reasonable and accurate means by which to determine value."

█ We concur in the trial court's conclusion that Firestone's real dispute with the board was not over procedure, but over its failure to adopt Firestone's premise that the property should not be valued as a tire manufacturing plant. We also agree with the trial court that substantial evidence supports the board's conclusion that it was reasonable for the assessor to value Firestone's plant as a going concern. Assistant assessor Gene Haller testified that as of March 1, 1980, the plant was a fully functioning industrial plant operating at near capacity with three shifts of workers. When it closed in 1980, it was placed on the market for $31 million. Supervising auditing assessor Joe Pitta testified that Firestone acquired over $2½ million worth of furniture and equipment for the plant in the 14 months prior to the plant closing. On the "plant closing date" (presumably Mar. 18, 1980) over half a million dollars' worth of construction was in progress. In the three years prior to 1980, Firestone had spent almost $10 million for equipment for the plant.

Mr. Pitta also testified that the Salinas plant was a "modern, single-story plant," and the only one of the five plants Firestone closed which had radial tire production capabilities. He also noted that the Salinas plant was a distribution as well as a production facility, and that in 1979 bias tires still represented 44 percent of the industry's output. He concluded from this picture that the decision to close the Salinas plant had not been planned for a long time, and that on March 1, 1980 "nobody except the people in Akron" knew the plant closing was going to happen. There was also testimony that over 50 percent of plant capacity was devoted to the production

of radial tires, and that the plant continued to operate for several months after the closure decision was announced.

Firestone's experts' valuation was based on a hypothetical sale of the property, not as a tire manufacturing and distributing plant, but as a building subdivided for other uses. It should have been based, however, on the plant's use as an ongoing business, as it was in March 1980. As the Assessor's Handbook, General Appraisal Manual points out: "For unique or nearly unique properties which are 'going concerns,' there is generally a very small number of people with a relevant demand for the property. In this instance, the appraiser must visualize a market composed of people who would use the property in a manner similar to the way the present owner uses it, unless it is clearly apparent that the market would adapt it to a more profitable use." (Assessor's Handbook 501, General Appraisal Manual, *supra*, at pp. 13-14.)

It is apparent from the evidence presented to the board that anyone but an expert in tire industry economics would have considered the Firestone plant, prior to the closure decision, as a well-capitalized, viable entity. We are satisfied, after reviewing the record, that substantial evidence supports the trial court's implied conclusion that a reasonable person, acting reasonably, might well have valued Firestone's property in the same manner as the assessor. (*Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d at p. 1026.) This is all that is required.

B. Toxic Waste Cleanup Costs

Monterey County has cross-appealed, challenging the trial court's conclusion that the cost of cleaning up pollution at the plant reduced its fair market value, and that the board was required to determine the appropriate reduction in this value and reduce the property's assessed valuation accordingly.

The county advances several novel arguments in support of its position that we should overturn the trial court on this issue. It contends cleanup costs are not part of the unencumbered fee which is valued for tax purposes; that groundwater contamination represents damages to the public; that liability for cleanup costs does not run with the land but with the waste generators; that since Firestone was forbidden to sell the property before it was environmentally clean, cleanup costs could not have been transferred with the fee in a hypothetical sale; that only the use restrictions specified in Revenue and Taxation Code section 402.3 may be taken into account as

affecting the property's value; and that Firestone would be unjustly enriched by its wrongdoing if such an offset were allowed.

We agree with the county that the trial court's order on this issue should be reversed. Although the grounds for our reversal do not fall squarely within the parameters of the county's arguments, we will discuss a number of its arguments.

The board's finding on this issue was as follows: "The [b]oard finds that addressing the hazardous waste management costs of doing business is a corporate responsibility. Irrespective of whether the hazardous waste problem at the Salinas plan[t] occurred by negligence, design or pure accident, the corporate entity is responsible for the cost of doing business within the limitations imposed by law. The cost of hazardous waste cleanup is not chargeable against individual corporate assets, but is instead a cost of doing business, to be borne by the corporate stockholders. To acc[ede] to [Firestone's] line of reasoning would require the taxpayers of Monterey County to support the cost of cleanup in the form of reduced taxes resulting from a reduced assessment. Such a result appears contrary to the very nature of environmental pollution control laws. No relevant statutory or case law applicable to the facts of these appeals has been cited by [a]pplicant to support its contention in this regard."

The trial court took issue with this finding, and concluded that it was not supported by substantial evidence. It cited Firestone's offer of proof that the pollution had occurred before the lien date, and that a knowledgeable buyer would have inspected the property for toxic pollution. It determined the board's conclusion that it would be bad policy to allow such a reduction in the assessed value was irrelevant, since there was "no dispute" that the cost of toxic waste cleanup reduced the fair market value of the property.

1. Valuation of Property for Tax Purposes

Article XIII, section 1, subdivision (a), of the California Constitution provides: ". . . [a]ll property is taxable and shall be assessed at the same percentage of fair market value." Fair market value is defined in Revenue and Taxation Code section 110 as "the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." The California Supreme Court has interpreted fair market value to

mean "the market value of property for use in its present condition." *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 561-562 [290 P.2d 544]; see also *Dennis* v. *County of Santa Clara, supra*, 215 Cal.App.3d at p. 1026; *County of Los Angeles* v. *McDonnell Douglas Corp., supra*, 219 Cal.App.3d at p. 724.)

In light of these well-established principles, we agree with Firestone that the board's function was limited to determining the fair market value of Firestone's property, and that its finding on the hazardous waste issue is erroneous as a matter of law.

2. The Nature of Pollution Cleanup Costs

In support of the board's conclusion, however, Monterey County proposes a variety of arguments in support of its position that pollution cleanup costs do not affect a property's fair market value. They argue first that pollution cleanup costs are not part of the "fee simple unencumbered rights" which are the basis of an appraisal for property tax purposes. (*Carlson* v. *Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1013 [213 Cal.Rptr. 555], citing Assessor's Handbook 501, General Appraisal Manual, *supra*, at p. 18.) The county's argument is unpersuasive, however. Pollution is not akin to the private deed restrictions in *Carlson,* or to the below-market rental agreement in *Clayton* v. *County of Los Angeles* (1972) 26 Cal.App.3d 390 [102 Cal.Rptr. 687]. The contamination did not restrict Firestone's use and disposition of its property before the plant closed. Whether toxic cleanup costs represent property damage or equitable remedies, or as the county also argues, damage to third parties or damage to public rights, and notwithstanding that they are legal obligations resulting from corporate conduct, the salient question remains whether the contamination affected the fair market value of the property, and if so, to what extent.

Monterey County next argues that liability for cleanup costs belongs to the pollution generators, and does not run with the land. Again, while it may be correct that liability for the costs of cleanup may not be transferred, and outlives property ownership, this argument, like the previous one, does not address whether, and to what extent, the property value was affected by the contamination.

Similarly, the county argues that in a hypothetical sale of the property, which was the basis of Firestone's experts' appraisal testimony, the fee could not have been transferred encumbered by the cleanup costs, since the

DHS had forbidden the sale of the plant, or its use for any other purpose, until the cleanup had been completed.

We will briefly review the record evidence on this issue. Firestone's expert Haskell Berry testified at the board hearing that the estimated cost of cleaning up contamination at the Salinas plant, almost $6 million, included removing some contaminated soil, removing asbestos from the building, "a general cleanup of the interior of the building," and $150,000 for off-site investigation to determine the extent to which hazardous waste materials had leached into the groundwater on adjoining property. He also testified that any buyer, in 1980, would have conditioned an offer to purchase on the plant being environmentally "clean." In his opinion, a knowledgeable prospective purchaser would either "have a front-end deduction from the value of the property to remove [the pollution] or he is going to demand the seller do this."

There was also evidence that "[w]hile the Firestone property has never been officially designated as a 'hazardous waste property,' DHS has advised Firestone that in view of the acknowledged presence of hazardous wastes on the property, no 'new use' of the property will be permitted until the State has granted final approval of a closure plan providing for the removal of hazardous wastes from the property." This statement was contained in a letter from Firestone to its expert, Mr. Berry, which was made an exhibit at the board hearing. The letter refers to Health and Safety Code section 25232, subdivision (a), part of the California Hazardous Waste Control Act (Health & Saf. Code, § 25100 et seq.). This subdivision prohibits "(1) Any new use of the land, other than the use, modification, or expansion of an existing industrial or manufacturing facility or complex . . . ."

In addition, Firestone's attorney described the restrictions on the plant as follows: "Firestone has been informed by the Department of Health Services that they will not be allowed to sell this property. They will not be— no one will be allowed to put this property to any other use until there has been an environmental clean bill of health issued with respect to the site."

Monterey County argues that since Firestone did not have the option of selling the property while it was polluted, a hypothetical sale should also have been based on the assumption that the plant would have been sold in an environmentally clean, not a contaminated state. This argument is really a challenge to the basis of Firestone's expert appraisers' testimony, which was based on a hypothetical sale of a contaminated property. It was apparently this testimony which led the trial court to conclude that the deleteri-

ous effect of toxic contamination on a property's fair market value was undisputed.

■ The salient issue is not whether a contaminated property is worth less than an environmentally clean one, however, but as in the property tax valuation question discussed *ante*, whether the assessor should have valued Firestone's property for tax purposes in 1980 as a polluted property. On this issue, we conclude insufficient evidence supports Firestone's position that the assessor knew, or should have known, that its plant was contaminated on March 1, 1980.

The record evidence on this issue is as follows: One board member questioned Firestone's counsel as to whether, in 1980, the contamination had been discovered, stating "I am under the impression the extent of the contamination has only been revealed the last two months." Firestone's counsel also stated later in the hearing that health hazards at the plant had first been identified by DHS on December 24, 1981.

The assessor was later asked an analogous hypothetical by a board member: Whether, if property was infested by termites but the infestation was discovered only when the property was sold after March 1, this discovery would have any effect on the assessment for that tax year. The assessor responded that it would not, barring disaster or catastrophe, but it would be recognized in the following year's tax valuation.

The assessor also reiterated, in response to later questioning by board members, that it had no knowledge of the contamination on the lien date in 1980, that the pollution at Firestone's plant was only established much later, and that it had not been established that the contamination existed on the lien date in 1980.

Firestone's offer of proof that the pollution had started as early as 1964 is not, itself, evidence. Firestone's counsel noted "we had a witness that we planned to have here from the consulting firm retained by Firestone to address any such question [concerning whether the contamination occurred after March 1, 1980]. . . . We called him last night and told him he need not come because no question had been raised in relation to the contamination testimony." Counsel then went on to argue that the plant ceased operation in August 1980, and "since that date there have been no events there to anybody's knowledge that could have caused the contamination. . . . All the evidence points to the fact that the contamination occurred over a period of years beginning in 1964 as the product of a number of spillages of chemical materials and it was a gradual accumulation. The well tests, of

which there have been hundreds, show that the contamination has percolated, that the percolation rates established that it has been a long continuing event. The—the—there w[as] superficial evidence of contamination in dirty soil as of March 1, 1980 [*sic*]."

This is not evidence; it is argument. The evidence presented by Firestone was that a knowledgeable buyer would have inspected for contamination, and that the sale price of the property would have been reduced if contamination had been found. There was no evidence presented to the board that the contamination had come to light on the 1980 lien date, however.

We have reviewed the entire record and find the weight of the evidence supports the conclusion that as of March 1, 1980, a potential purchaser would not have been aware of the contamination, the full extent of which, after its initial discovery in 1981, may not have been revealed until a few months before the April 1984 board hearing, and indeed, until much later still.

In addition, as we have already discussed in relation to Firestone's appeal, we find unpersuasive its implied position that an assessor should be held to knowledge obtained after the fact. That Firestone ceased plant operations six months after the lien date did not persuade us the property should have been valued other than as a tire plant; similarly, the fact that contamination was discovered at the plant after operations ceased does not persuade us that whatever reduction in the plant's fair market value was caused thereby would provide the basis for reevaluating the property for tax purposes for 1980.

■ Firestone argues, in support of the trial court's conclusion on this issue, that such an offset is mandated by Revenue and Taxation Code section 402.3. Both Revenue and Taxation Code sections 110 and 402.1 allow an assessor to consider the effect of use restrictions on a property's value. (*Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d at p. 1010.) Revenue and Taxation Code section 402.3 requires an assessor to consider "any restrictive covenant, easement, restriction, or servitude adopted pursuant to Section 25202.5, 25222.1, or 25355.5 of the Health and Safety Code or any restriction, easement, covenant, or servitude imposed pursuant to Section 25230 of the Health and Safety Code as an enforceable restriction, easement, covenant, or servitude subject to Section 402.1 and shall appropriately reassess any land, the use of which has been so restricted, at the lien date following the adoption or imposition of the covenant, easement, servitude or restriction."

The sketchy record evidence on this issue tends to suggest that the use restrictions here were not imposed under the authority of the enumerated statutes. Even had they been, however, there is no dispute that the restrictions were not in effect during the 1980 tax year; 1982, on the record before us, appears the earliest conceivable date when they could have been imposed.

The statute would be unavailable to Firestone in 1980, in any event, because it was still using the property in the same manner it had been used for the past 17 years. Since the property was not being put to a different use on March 1, 1980, any use restrictions would have had no effect until Firestone abandoned its facility and decided to sell the plant.

In light of our conclusion on this issue, we find it unnecessary to address Monterey County's other contentions: that since the contamination damaged public as well as private interests, the 'cost of repair,' or in this case, 'cost to remove' the contamination was not the correct method of valuing its effect on the fair market value of Firestone's property; that we should reverse the trial court because Firestone would be unjustly enriched if a deduction for cleanup costs were allowed; that such a deduction would violate constitutional mandates of equality and uniformity in taxation; and that it would result in an unconstitutional exemption of taxable property. These arguments must wait for another case.

That part of the judgment upholding the Monterey County Assessment Appeals Board's valuation of Firestone Tire and Rubber Company's Salinas plant for tax purposes for the 1980 tax year is affirmed; that part of the judgment remanding for an appropriate reduction in valuation to reflect the cost of toxic cleanup is reversed. Each party to bear its own costs.

Premo, Acting P. J., and Cottle, J., concurred.