[No. G022200. Fourth Dist., Div. Three. Apr. 27, 2000.]

MOLA DEVELOPMENT CORPORATION, Plaintiff and Respondent, v. ORANGE COUNTY ASSESSMENT APPEALS BOARD NO. 2, Defendant and Appellant.

**COUNSEL**

Laurence M. Watson, County Counsel, and Jim Persinger, Deputy County Counsel, for Defendant and Appellant.

Smith, Silbar, Parker & Woffinden and Keith M. Parker for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

The question before us is whether the assessment appeals board erred in its methodology in valuing certain contaminated commercial real property

in Irvine in the early 1990's. The board took what it determined to be the fair market value of the property if unpolluted, then deducted the cost of cleanup, but next *added back in* expected contributions toward the cleanup from two former owners. The taxpayer then successfully petitioned the trial court for an order mandating the board to subtract the amount that it had added back in, and the board has now appealed to this court.

As we explain below, it is not accurate to say that the assessed value of contaminated property is ipso facto the fair market value of the property uncontaminated, minus the cost of cleanup (or, as the board approached the problem, minus the *net* cost of cleanup *to the seller*). To be totally accurate, the assessed valuation is the price at which a willing buyer and a willing seller would consummate an open market sale of the property *considering the polluted condition of the property.* (See *De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 561-562 [290 P.2d 544] (*De Luz Homes*) ["full cash value" might also be called "market value of property for use in its present condition"].)

In the real world, as the high court of New York has noted, deducting cleanup costs is an "acceptable, if imperfect surrogate" to gauge the true open market value of property. (*Commerce Holding v. Assessors of Babylon* (1996) 88 N.Y.2d 274 [649 N.Y.S.2d 923, 673 N.E.2d 127, 131].) It is most certainly an acceptable surrogate where the property, as here, is vacant and not generating any income stream.[1] Comparables for polluted property are, after all, hard to come by.[2] That is because, given the potentially astronomical liability for cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), no rational buyer is going to want to touch commercial property unless effectively immune from CERCLA liability, and therefore will require from the seller either a discount on the nominal price or a promise to pay all cleanup costs (and then the buyer will require the seller to have pockets deep enough to cover any such promise).

The applicable statute, section 110 of the Revenue and Taxation Code, contemplates a hypothetical open market transaction, where no side is under

---

[1] Courts can only decide the case before them. *This* case involves vacant, functionally unimproved commercial property on which literally millions must be spent to clean it up, but was at the time of the lien date generating no income. We do not formulate any broad general principles for other kinds of property, such as industrial property already generating a large income stream.

[2] See, e.g., Morley and Kelley, *Challenging Tax Assessments on Contaminated Property in Florida* (July/Aug. 1998) 72 Fla. Bar J. 51, 52 ("often there is little or no market data available concerning contaminated land").

any "exigencies" and both have "knowledge of all the uses and purposes to which the property is adapted." (Rev. & Tax. Code, § 110; see also *De Luz Homes, supra*, 45 Cal.2d at p. 562 [observing that § 110 provides "for an assessment at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other"].) In such a hypothetical transaction, there is no reason for any buyer to pay more. (Cf. *De Luz Homes, supra*, 45 Cal.2d at p. 567 [" 'Appraising presupposes a purchaser' "].) And basically the board agreed with that fundamental idea here, by utilizing in its computation of value the fair market value of the property minus the cleanup costs.

The real question, then, in this appeal, is whether the open market transaction envisioned by the statute is better approximated by deducting the *net* cleanup costs to the seller, or the gross cleanup costs applicable to the property that must be paid by *somebody* under applicable environmental law. It is on that question that the taxpayer and the board disagreed, with the trial court siding with the taxpayer. We think the taxpayer has the better part of the argument. Buyers don't care *who* pays the cost of cleanup as between the seller and third parties (or "potentially responsible parties" in CERCLA speak). From the point of view of what *buyers* will pay, net cleanup costs (or net fix-up costs) *to the seller* are irrelevant. Buyers only care that *they* don't pay them. The trial court was therefore correct in making its order requiring the board to subtract the promised contributions from third parties that it had added back in to the assessed valuation.

## II. Discussion

### A. *Facts*

In December 1987, Mola Development Corporation bought more than 20 acres of prime, but at the time vacant, real estate in the City of Irvine, located at the corner of Jamboree Road and Campus Drive. The transaction was part of the purchase of a larger property from Prudential. Mola envisioned a high-quality mixed-use development (Mola Centre), consisting of a 450-room hotel, 483,000 square feet of office space in a 20-story office tower and adjoining structures, over 1,000 apartment and condominium units, festival retail, and a 2,100-seat multiplex cinema.

Mola knew the vacant property was riddled with toxic waste from a former Beckman Instruments facility, but agreed to pay $46 million with the understanding that Prudential and Beckman would take remedial action and

cure it. Beckman and Prudential did undertake remediation efforts, and Mola sold a portion of the property to another developer.

Mola retested the soil and discovered that the original cleanup efforts had been unsatisfactory. A new remediation plan, prepared by Harding Lawson Associates, estimated additional expenditures of $16.7 million over a 10-year period to treat the contaminated ground water. Beckman agreed to pay approximately $10 million; and Prudential agreed to pay $2.5 million, leaving Mola on the hook for the remainder. (Prudential ultimately made "some kind of arrangement with Mola" and took the property back. Mola ultimately incurred no remediation cost.)

The Orange County Assessor assessed the property at $39.4 million for the 1990 tax year and $41 million for 1991. Mola, as the property owner of record, paid the taxes and appealed to the Assessment Appeals Board No. 2 for the County of Orange.

There were two hearings of the assessment appeals board in October 1992 regarding Mola's application for change of assessment, based on then "current economic conditions" (a nasty recession was then overtaking the county) and "the presence of toxic materials underground."

Mola was represented at the hearing by a CPA firm, Kenneth Leventhal and Company, and primarily by its expert witness, Walter Hahn, a Ph.D. and real estate economist with the firm. The first hearing took place on October 23, 1992. The board was fully aware that the problem of valuing the property in light of contamination loomed before it, and specifically sent for the county counsel because of the problem.

Mola's presentation began with its overall position: The property was worth $26 million if not contaminated, and from that $26 million, $16.7 million in cleanup costs should be deducted, leaving a value for property tax purposes of roughly $10 million. Dr. Hahn then gave an extensive presentation involving the value of the property based on projected costs and revenues from the various uses to which it would be put after it was developed.

Dr. Hahn also testified as to the cost of cleanup. He referred to a "really severe summary of the toxic issues," which "[he] let [the board] read what it [said]." More particularly, he said: "Harding Lawson did a fairly thorough analysis of it, they did a thick report on it. And their estimate was it cost sixteen million seven hundred and twenty thousand dollars to fully clean it

upon meeting county health standards." Dr. Hahn elaborated that much of the cost was because "contamination has gotten into the groundwater" and a 10-year pump-out and return treatment plan was required, as well as "digging out the soil and replacing it with clean fill."

Dr. Hahn then opined that the fair market value of the site was its value as if uncontaminated, minus the cost of cleanup. He stated, "[a]nybody buying that [site], if you're talking about fair market value, is going to take the fair market value of that property as if it were uncontaminated, which I've estimated, and they're going to subtract from it the [$16.7 million]. [¶] So if you're talking about fair market value as a basis for assessed value, to me that's it." He also said that while a willing buyer "perhaps" would consider the fact that Prudential and Beckman would pay for most of the cleanup costs, he viewed such a potential contribution as "irrelevant" to the valuation issue because "it's got to be paid by somebody." Dr. Hahn based his opinion on his experience with evaluating two other contaminated parcels, where "[u]niformly I found . . . that the property was valued by taking the market value of the property as if uncontaminated and deducting from it the cost to clean up."

There was no dispute at the hearing that the cleanup costs were $16.7 million. The figure was never questioned by the assessor when he presented the case for the county. Instead of focusing on the cleanup amount, the assessor focused on (1) *who* had liability for the cleanup costs, (2) *whether* any adjustment at all should be made for the fact that the property was contaminated and had to be cleaned up, and, if so, (3) whether the adjustment should be *amortized* over some period of time.[3] And while Mola did not introduce into the record the full "thick report" from Harding Lawson,[4] it did provide the summary giving a breakdown of the constituent parts to the cleanup.

---

[3]Here are the salient portions of the assessor's testimony: "[After alluding to an article by an attorney from Louisiana on the toxic cleanup adjustment problem] And the basic gist of this analysis is basically that should the taxpayers of the County of Orange assume the—the abatement of property tax based upon the fact that the property has toxic waste on it. [¶] We have not established, I believe, that—who would have the liability or who made the toxic waste or who is going to clean it up. But as far as valuing property, as fee simple unencumbered use of the property. [¶] And to allow a reduction in property valuation based on toxic waste is—I guess to have the taxpayers of the County of Orange assume that portion of that liability and I don't think that is should be appropriate in this situation. . . . [¶] If anything, it should—like I said the recognition of the amount of reduction should have been taken over a period of time and should have an expense of the investor that buys the—or the investor that buys the property. And like I said, spread out over a period of time. Their proposal that we take the full sixteen million dollars ($16 million) out in one year . . . ."

[4]Most likely because Mola's CPA's did not want to trumpet the fact that they expected the prior owners to contribute to the remediation of the property.

The board clearly saw the toxic problem before it as a methodological (i.e., legal) one, not a question of substantial evidence. At the very start of the second hearing on October 28, the board chairman began: "Now just to refresh everyone's memory and hopefully mine is correct, the reason we continued this is because we asked for an opinion from county counsel on whether we can or cannot deduct values based on a cleanup of this property."[5]

The parties then argued their positions as if they were in front of a law and motion court confronted with the need to make a ruling on undisputed facts, with much of the discussion centering on the decision of the Court of Appeal in *Firestone Tire & Rubber Co. v. County of Monterey* (1990) 223 Cal.App.3d 382 [272 Cal.Rptr. 745] (*Firestone*). (We discuss this case in a footnote below because it can be easily misread, in that it contains cogent dicta which, counterintuitively, cuts in the opposite direction of the court's actual decision.) The assessor never questioned the $16.7 million cleanup figure, but rather disputed whether the cleanup amount should be taken "straight off the top" of the uncontaminated value. The assessor said he did not "think that really equitable."

After a recess the members of the board announced their decision. The board reduced the assessments to $33.6 million for 1990 and 1991. It arrived at the figure by calculating the property's fair market value at $36.8 million, exclusive of any loss in value because of the contamination. Since Beckman and Prudential were obligated to pay $12.5 million of the $16.7 million total, the board determined that willing buyers would subtract $3.2 million as the present value of Mola's pro rata share.

Mola sued in superior court for a refund of property taxes. In August 1997, the superior court ruled the board should have deducted the entire $16.7 million and remanded the matter to the board.

---

[5]At the previous hearing the chairman, as part of a colloquy with Mola's lead CPA in the *context* of whether Mola had an "absolute right" to contribution from the two prior owners, observed that the $16.7 million figure was not an "absolute," but an "estimate." ("Well, you don't have an absolute value of sixteen million seven twenty either. You have an awful lot of estimates here that people say its going to cost to do that.") This oblique statement is the only one in the entire record which even makes a hint of a suggestion that the cleanup figure was not a given. Obviously, though, the chairman's remarks at the beginning of the second hearing show he had come to believe that the question was methodological, not factual. Moreover, any arguable doubt was later erased by the fact that the board indeed used the $16.7 million figure—minus estimated contributions from the prior owners—to make an adjustment to the assessor's figure.

## B. *The Expected Contributions from Third Parties Should Not Have Been Added Back into the Cleanup Costs for Purposes of the Property Tax Valuation of the Subject Property*

### 1. *Public Policy Irrelevant When It Comes to Property Tax Valuation*

How *are* pollution cleanup costs to be handled in property tax valuations? This is, essentially, a question of valuation methodology, i.e., one of law. (See *Firestone, supra,* 223 Cal.App.4th at p. 387 ["The method of valuation presents a legal issue subject to judicial review"]; *Main & Von Karman Associates v. County of Orange* (1994) 23 Cal.App.4th 337, 342 [28 Cal.Rptr.2d 432] [contentions which go to methodology present questions of law].)

Preliminarily, a few basic principles should be kept in mind. There is a tendency when it comes to questions bearing on the property tax valuation of contaminated property to think in terms of public policy, wrongdoing, or *personal* liability. That tendency animated some of the assessor's testimony before the board, when he complained about "the taxpayers of the County of Orange assum[ing]" the portion of the "liability" that would be paid for by the two former owners, and in the county's briefs in this appeal, where it continually returns to the theme that Mola, at the time of the hearing, had yet to pay "one dime" toward cleanup costs. The underlying idea seems to be that fair market value is somehow dependent on the innocence of the landowner.

The thought also formed part of the argument of the county in the *Firestone* case, where the county made the argument that it was unfair to the taxpayers of the county "to support the cost of cleanup in the form of reduced taxes resulting from a reduced assessment." (See *Firestone, supra,* 223 Cal.App.3d at p. 391.) In *Firestone* the landowner was not "innocent" but the operator of a tire plant which, over the years, had been the site of enough spillage to prompt a pollution cleanup effort by the 1980's.

But we must not forget that when it comes to the seemingly arcane world of property tax valuations, it is a Constitution we are expounding. Property tax valuations are governed by article XIII, section 1, subdivision (a) of the state Constitution, which requires all property to be assessed at "fair market value." (See also *Firestone, supra,* 223 Cal.App.3d at p. 391.) The dispositive question is, therefore, always—as the *Firestone* court clearheadedly pointed out—not *who* has the liability for cleanup costs, but "whether, and to

what extent, the *property* value was affected by the contamination." (*Firestone, supra*, 223 Cal.App.3d at p. 392, italics added.)

The idea of innocence as the talisman for a reduction in a valuation assessment was properly rejected by the appellate court, albeit in dicta, in the *Firestone* case. Thus, even though the taxpayer lost the case on the ground that no potential purchaser would have been "aware of the contamination" as of the lien date for the property tax year in question (1980) (see 223 Cal.App.3d at p. 395), the court still felt compelled, in its general statement of principles at the outset, to announce the proposition that "where the cost of pollution cleanup reduces the fair market value of property, it may form the basis for a reduction in that property's assessed valuation." (*Id.* at p. 385.)[6]

The Supreme Courts of New Jersey and Massachusetts have also explicitly rejected introducing considerations of public policy into questions of property tax valuation, noting that a constitutionally mandated focus on *value* is a matter independent of public policy. (See *Inmar Associates, Inc. v. Borough of Carlstadt* (1988) 112 N.J. 593 [549 A.2d 38, 41] (*Inmar*) ["We begin with the constitutional bedrock . . . . We would be no more able to alter that standard to effectuate environmental policy . . . ."]; *Reliable Electronic v. Board of Assessors* (1991) 410 Mass. 381 [573 N.E.2d 959, 960] ["The fact that a landowner . . . even intentionally has caused environmental damage to its real estate, thereby reducing its fair market value, would not justify valuing that property for local tax purposes as if that damage had not occurred."].)

---

[6]*Firestone* is valuable for its dicta (see 223 Cal.App.3d at pp. 390-393), because its actual holding is a rather prosaic one: The taxpayer did not show that the need to clean up the property existed as of the lien date. The key language as far as the actual holding case is found on page 395 of the opinion: "[A]s of March 1, 1980, a potential purchaser would not have been aware of the contamination, the full extent of which, after its initial discovery in 1981, may not have been revealed until a few months before the April 1984 board meeting, and indeed, until much later still." Accordingly, the appellate court held that it was error for the trial court, as it had, to remand the assessment back to the appeals board for a reduction based on the "valuation for the 1980" tax year. (*Firestone, supra*, 223 Cal.App.3d at p. 385.)

If the *Firestone* court had decided not to write a thoughtful essay about the problem of valuing polluted property, the opinion might have been the subject of *per curiam* treatment. For example: "Firestone contends that the value should be reduced by the cost of cleaning it up; however, as of the lien date no one knew that it even needed to be cleaned up, so the argument fails. The trial court was therefore wrong in remanding the assessment to the board and the judgment is hereby reversed." The opinion might have stopped there and never seen the light of publication.

### 2. *The Open Market Value of This Unimproved Contaminated Property Is Best Approximated by Subtracting the Present Value of the Cost of Cleanup*

#### a. *California Law*

The general question of exactly *how* unimproved contaminated land should be valued is, of course, a more conceptually difficult problem. Again, reference to the constitutional "fair market value" standard is important. Section 110, subdivision (a) of the Revenue and Taxation Code[7] provides that (except as otherwise modified by the operation of Prop. 13 pegging value to a 1975 lien date), " 'fair market value' means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions *in which neither buyer nor seller could take advantage of the exigencies of the other,* and both the buyer and the seller have knowledge of all the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes." (Italics added.) Moreover, section 51, subdivision (a)(2), provides that "full cash value" (which, according to § 110 is the same as "fair market value") as defined in section 110 must take "into account reductions in value due to damage."

Section 110, with the gloss put on it by section 51, has implications. The most significant for our purposes here is that the statute's hypothetical buyer has no *special* reason to desire any given piece of property. The hypothetical buyer for assessment purposes, for example, is not under any special constraint to buy the property because of the need to expand into neighboring property, or because its location is *peculiarly* suited for its business. Thus, it might be the case, conceivably, that a particular buyer (a true "greater fool" in investment parlance), under the delusion that a leprechaun had buried a pot of gold on otherwise contaminated property, might pay more for it than its uncontaminated value minus the present cost of cleanup. But that would not be an accurate approximation of open market value as defined by section 110 because this very peculiar buyer is acting out of secret knowledge or delusion. The statute contemplates a situation in which all information regarding any possible pot of gold on the property is already on the table.

Because the statute contemplates a lack of "exigencies," it is very hard to imagine that any potential rational buyer in the real world paying *more* than the unimpaired value of the property—at least vacant, non-income-producing property such as in the case before us—minus cleanup, either by way of a straight reduction in purchase price, or by way of some sort of an indemnification agreement or other consideration to that effect, from the

---

[7]All undesignated statutory references in this opinion will be to the Revenue and Taxation Code.

seller. A buyer might pay *less* (because of the stigma effect, and for an adequate reserve against CERCLA liability), but would have no reason to pay more. (See *Westling v. County of Mille Lacs* (Minn. 1996) 543 N.W.2d 91, 92-93 [affirming assessment based on taxpayer's expert who not only deducted present value of future costs of cleanup but a "stigma discount" in addition].) After all, there will always be the *fear* that not all the pollution was cleaned up, and therefore a certain reserve would be prudent. (See *San Diego Gas & Electric Co. v. Daley* (1988) 205 Cal.App.3d 1334 [253 Cal.Rptr. 144] [public fear of electromagnetic radiation, even if irrational, could still present compensable loss of fair market value];[8] see also Casparian, *Good Deed Punished* (Jan. 31, 2000) Cal. Law Business at p. 20 ["A landowner who cleans up contamination caused decades ago by an unknown prior owner might be shocked to find himself labeled a hazardous-waste generator and then taxed as such."].)[9]

We must remember that there are few worse nightmares for a property owner than to find that property is contaminated and must be cleaned up. Liability under CERCLA can be one of the most draconian consequences in American law. Unless property owners can fit themselves within CERCLA's innocent landowner provisions—which at least some federal courts have said includes core sampling (see *Franklin County Convention v. American Premier* (S.D.Ohio 1999) 61 F.Supp.2d 740, 745)—they are strictly liable for cleanup costs. (See *Commerce Holding v. Assessors of Babylon* (1996) 88 N.Y.2d 724, fn. 3 [649 N.Y.S.2d 932, 673 N.E.2d 127, 129] ["CERCLA is a strict liability statute that imposes liability on property owners such as Commerce without regard to fault"]; see also *Tanglewood East Homeowners v. Charles-Thomas, Inc.* (5th Cir. 1988) 849 F.2d 1568 [prior owner was polluter, developer still liable]; *U.S. v. A & N Cleaners and Launderers, Inc.* (S.D.N.Y. 1994) 854 F.Supp. 229, 244 [owner responsible for pollution caused by tenants and subtenants].) That harsh reality necessarily makes itself felt in the marketplace. (See *Inmar, supra,* 549 A.2d at p. 41 ["There will be no avoiding the economic effect of these regulatory programs."].) The hypothetical buyer contemplated by section 110, i.e., one under no "exigencies" forcing it to bargain for the property, can save itself a tremendous headache simply by buying uncontaminated property.

---

[8]In *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720 [66 Cal.Rptr.2d 630, 941 P.2d 809], the Supreme Court observed that the *Daley* court "strayed" on a different point.

[9]In the present case, the taxpayer did not present evidence of stigma (as distinct from cleanup costs), so we are spared the need to say anything more on the subject except to note that at least two commentators consider the "stigma discount" a matter more open to controversy than the cost of cure. (See Thomas & Clayton, *Challenging Valuations of Contaminated Property* (Apr. 1997) 26 Colo. Law. 71, 72.)

In the case before us, for example, it is not accurate to say that Mola paid $46 million in 1987 for "the property" and just stop there. Mola paid $46 million for the property *and* for an important intangible—an indemnity agreement. The seller received $46 million *minus* the value of the seller's agreement to clean it up. (Of course, using indemnity agreements only works when sellers have deep pockets, such as Beckman and Prudential).

### b.  *Out-of-state Cases*

In the mid-1990's, as CERCLA jurisprudence was more fully developed, the Minnesota and New York high courts each issued decisions approving valuations by deducting the "cost to cure" from the otherwise unimpaired market value of the property. In *Westling v. County of Mille Lacs, supra*, 543 N.W.2d 91, 93, the court affirmed a judgment reducing the value of property to zero because neither side's expert appraiser "suggested that the market value of the property, unimpaired by contamination, was greater" than the "cost-to-cure." Likewise, in *Commerce Holding v. Assessors of Babylon, supra*, 673 N.E.2d 127, the court also affirmed a judgment using the taxpayer's valuation based on subtracting the cost-to-cure. While the court noted that there "has yet to emerge any single generally accepted valuation methodology" (*id.* at p. 130), it also said that "cleanup costs are an acceptable, if imperfect, surrogate to quantify environmental damage and provide a sound measure of the reduced amount a buyer would be willing to pay for contaminated property." (*Id.* at p. 131.)

Two foreign cases of which we are aware have rejected deducting the cost of cure, *Inmar, supra*, 549 A.2d 38 and *Sweepster, Inc. v. Scio Tp.* (1997) 225 Mich.App. 497 [571 N.W.2d 553] (*Sweepster*). Neither is persuasive.

In *Inmar, supra*, 549 A.2d at page 39, the New Jersey Supreme Court termed the deduction-of-cost-to-cure approach a "simple expedient," and appeared to reject it out of hand. (See also *id.* at p. 43 ["One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property."].) There are several reasons, however, that *Inmar* does not present even persuasive authority for us to follow.

First, New Jersey property assessments are tied to something called "true value," not necessarily open market value. Thus on page 44 of the opinion in the regional reporter (549 A.2d) (in the portion of the text where the court appears to be rejecting the deduction approach), the New Jersey court took seriously the idea that property might have "value to the owner *even if there is no market*." But the idea of "value" independent of an open market is

contrary to the California Constitution and to section 110, which, as we have previously shown, require assessment by reference to an "open market." And under any standard pegged to what buyers and sellers do in an open market, it is almost impossible to imagine prudent buyers not demanding at least a dollar-for-dollar deduction of cure costs—reduced, of course, to present value.

Additionally, the *Inmar* court rejected the deduction approach not because deduction *qua* deduction does not reflect the behavior of potential buyers in an open market, but because a nominal dollar-for-dollar deduction does not "realist[ically]" reflect the fact that an investment in cure "might prudently be spread out by 'competent management' over a number of years." (*Inmar, supra*, 549 A.2d at p. 45.)

The *Inmar* court's introduction of the idea of time, however, does not refute the idea that cure costs should be deducted. The idea merely shows that the costs of cure should be reduced to *present value*, a point with which no one can really take issue.[10] After all, any buyer contemplating the contingency of being stuck with a property that had to be cleaned up would presumably think of financing the operation. So taking the present value of cost to cure makes sense, much like the fact that garden variety property values are indirectly affected by the mortgage market. And in fact, in the case before us, the cleanup costs have been reduced to present value.

However, it is important to distinguish, as the *Inmar* court perhaps did not take the greatest pains to do, the idea of present value from the idea of deducting costs of cure. In this regard, it appears that the *Inmar* court may have fallen into the same logical trap that the assessor fell into in the case before us, when the assessor opined that it was unfair to "take the full sixteen million dollars out in one year." Thus, instead of deducting the present value of $16.7 million from the fair market value of the property as if uncontaminated to arrive at its assessed value in a given year, like 1990, the assessor seemed to be advocating dividing the $16.7 million by the 10 years of cleanup, then taking the $1.67 million result (or its present value) and deducting only *that* from the uncontaminated value of the property for each of the next 10 years.

The idea is a major error in logic. One must remember that property tax assessments are made on a yearly basis, so the *entire* fair market value of the

---

[10]With one caveat. While various environmental laws may prevent the use or sale of the property, we do not deal with the question of the degree to which, if any, any deduction for present value should *itself* be offset by a corresponding deduction for the loss of use of the property occasioned by those environmental laws. That question, not briefed by the parties or in the record, may be safely reserved for another day.

property is assessed every year (albeit there may be an allowance for a homeowner's exemption). That yearly assessment, except as otherwise governed by Proposition 13, reflects the open market price of the property. But the open market price involves what willing buyers and sellers will consummate the transaction for, *in fee*, not just a year's lease. Thus the concern that the taxpayer somehow receives a windfall because every year's assessment reflects the *same* costs of cure is totally erroneous. The assessment *should* reflect the cost of cure—because every year's assessment reflects a hypothetical open market transaction *in fee*. It is precisely the full fair market value which is the subject of *every year's* assessment.[11]

Of course, the county also benefits from assessing the *entire* fair market value of the property every year, because in successive tax years the remaining costs to cure presumably decline, and the property correspondingly increases in value. As two commentators observe, "[o]nce the property is remediated and the contamination is gone, the clean value should again be applicable, unless the property owner can demonstrate permanent stigma." (Thomas & Clayton, *Challenging Valuations of Contaminated Property, supra*, 26 Colo. Law. at p. 71.)[12]

Finally, *Inmar* was unable to articulate any alternative approach (other than adjusting for present value).[13] The irony in this regard is that despite the *Inmar* court's language about rejecting deduction, when push came to shove in a lower court case in New Jersey some years after *Inmar*, the lower New Jersey court did, indeed, resort to precisely that approach. (See *University Plaza v. Hackensack* (1993) 264 N.J.Super. 353 [624 A.2d 1000].) In *University Plaza*, a New Jersey appellate court applied the deduction approach to a piece of property which was undergoing a voluntary asbestos decontamination program, reasoning that *Inmar* was a "unique" case. (*University Plaza, supra*, 624 A.2d at p. 1003.) The *University Plaza* court distinguished *Inmar*

---

[11]Suppose, for example, that a vandal painted your house purple just before the lien date. It is likely to drop in value from what it otherwise would have been, and the drop is likely to be at least the present value of a new paint job to restore your home to its previous tasteful color. Even so, you should receive the benefit of the drop in value *every year* the house goes without repainting; the assessor should not spread the decrease in value over the physical life of the new paint job.

[12]We see no reason this "recapture" effect would not include any intermediate years before total cleanup. That is, if $6 million of a $10 million cost of cure were expended in year one, the discount for cost of cure that a willing buyer would demand in year two would decline to $4 million (adjusting for present value, of course).

[13]The case does make an oblique reference to an "encumbered income stream" (*Inmar, supra*, 549 A.2d at p. 45), but at best this is simply a way of saying that the present value of the cleanup must be balanced against the present value of expected income, which is merely another way of describing the deduction approach.

on the basis that *Inmar* involved mandatory cleanup costs, whereas in the case before it the asbestos abatement costs were voluntary. (See *University Plaza, supra,* 624 A.2d at pp. 1002-1003.)[14]

*Sweepster* was a *per curiam* opinion from the Michigan Court of Appeals, involving a claim by the owner of 47 acres of income producing industrial property on which Chrysler had once conducted operations. The taxpayer claimed it was completely worthless because of contamination, and also argued that the tax tribunal should have deducted the cost of cure from the value of the property. (See *Sweepster, supra,* 571 N.W.2d at pp. 554-555.) The tribunal did give the taxpayer a break with a 10 percent stigma discount, though. (See *id.* at p. 554.)

The tribunal refused to deduct the cost of cure because the taxpayer had an indemnity agreement with Chrysler "for any environmental contamination found as a result of Chrysler's former operations." (*Sweepster, supra,* 571 N.W.2d at p. 554.) The tribunal determined as a matter of fact that the taxpayer would "not be financially responsible for the cost of cleanup." (*Id.* at p. 555.) The taxpayer appealed, but the Michigan appellate court affirmed, for reasons which are not persuasive in regard to Mola's situation.

The appellate court reasoned that the tribunal's determination that the taxpayer would not be responsible for the cleanup cost was a matter of substantial evidence before the tax tribunal, and that the taxpayer's "arguments in this regard [were] all premised" on it "or its successors being held liable for the costs of cleanup." (*Sweepster, supra,* 571 N.W.2d at pp. 555-556.) The indemnification agreement, according to the *Sweepster* court, expressly relieved the taxpayer or its successors from paying for remediation costs, and therefore the only discount that was appropriate was one for attorney's fees to enforce the indemnification, which was "counter[ed]" by the stigma discount. (*Id.* at p. 556.)

The most obvious flaw in the *Sweepster* court's analysis—at least for purposes of whether it should be exported to California—is that it is indifferent to the open market analysis required by section 110. As we explain in the next part of this opinion in discussing *De Luz Homes, supra,* 45 Cal.2d 546; *Pacific Mutual Life Ins. Co. v. County of Orange* (1985) 187

---

[14]Of course, if we may be forgiven for kibitzing about New Jersey common law, the *University Plaza* court's reliance on the difference between voluntary and mandatory cleanups is hardly a persuasive way of distinguishing *Inmar.* If anything, a *mandatory* cleanup leaves even less room for anything *but* a cost-of-cure deduction approach. The point is, when an unworkable doctrine is announced (in *Inmar,* a rejection of deduction of costs to cure), lower courts sometimes twist like Houdini to get around it. Well, at least in New Jersey.

Cal.App.3d 1141 [232 Cal.Rptr. 233] (*Pacific Mutual Life*); and *Carlson v. Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004 [213 Cal.Rptr. 555], California law looks to the hypothetical market transaction with a willing buyer. The *Sweepster* court looked only at the actual cost to the seller of a cleanup, not necessarily what the *property* would fetch on the open market. In this regard, the *Sweepster* court's obliviousness to the draconian realities of CERCLA liability further undercuts the persuasiveness of the opinion: In the real world where buyers of commercial property think there is any possibility of CERCLA liability, they are not going to touch the *property* without being fully insulated from that liability.

The obvious flaw in *Sweepster*, however, is the product of a more subtle flaw in its reasoning. It is true that a buyer in an open market transaction will either demand a reduction of the present value of cleanup costs (plus stigma reserve), *or* might be satisfied with an indemnification agreement from a deep pocket, such as Chrysler in *Sweepster*. But even when the buyer is satisfied with an indemnification agreement, the cost of that agreement to the seller is part of the effective consideration given for the property. If a seller has to give the buyer a blank check plus the property in the deal, it is not really accurate to say (as the *Sweepster* court assumed) that the "value" of the property is the nominal price of the property without regard to the value of the blank check. The open market value of the *property* is the nominal price minus the value of the blank check. Thus in *Sweepster*, to say as the court did, that the taxpayer "purchased the subject property . . . for $3.5 million" was not really accurate in the sense of conveying the true selling price of the property. Chrysler in that transaction did not really receive $3.5 million. It received $3.5 million *minus* the value of the indemnity agreement it had to throw into the bargain.

### 3. Should Contributions from Third Parties Be Added Back?

Finally, we come to the discrete legal point about which this assessment was really argued: Whether, after making a deduction for the present value of cleanup costs, estimated contributions (or, more properly, the present value of those contributions) should be added back into the assessed valuation.

This is not an altogether easy question, because of the interrelatedness of intangibles (the classic example is a liquor license) to the market value of real property. The leading case on the subject is *Roehm v. County of Orange* (1948) 32 Cal.2d 280 [196 P.2d 550] (liquor license could not be taxed as such, but its existence might have an effect on value). The *Roehm* court

noted that the state Constitution "does not . . . provide for the taxation of intangible assets other than" certain enumerated ones, but that they still "may be reflected in the valuation of taxable property," as, for example, when they generate earnings. (*Id.* at p. 285.) Of course, given the constitutional language, our guiding light must be how an open market would value the actual real property *qua* real property, not whether contributions from third parties are intangibles per se (they are, and for that reason they cannot be taxed as such).

In considering the open market value, it is important to again recognize the role of the hypothetical purchaser, as distinct from the peculiarized circumstances of the actual taxpayer. As Justice Traynor wrote for the *De Luz Homes* court in the context of valuation by capitalized earnings, "The net earnings to be capitalized, therefore, are not those of the present owner of the property, *but those that would be anticipated by a prospective purchaser.*" (*De Luz Homes, supra*, 45 Cal.2d at p. 566, italics added.) As Presiding Justice Trotter wrote for this court in the context of an architecturally unique building that would cost a lot more to replace than any prospective purchaser would ever pay for it, "The value of the building in the market is its value to potential purchasers generally, and the normal uses to which potential purchasers could put it must be considered." (*Pacific Mutual Life, supra*, 187 Cal.App.3d 1141, 1148.)

The idea that prudent buyers might be willing to lessen the discount that they would demand on sale of the property in light of the fact that parties other than the seller might also have to contribute to cleanup costs simply does not accord with market reality, because of one unassailable fact: From the hypothetical buyer's point of view, the peculiar circumstances of the seller, such as *its* ability to recoup costs for which *it* is already liable, is irrelevant.

The case law in California demonstrates the soundness of this proposition. In *De Luz Homes*, the high court held that it was error to use an appraisal method that, at root, looked to the "profitableness of the property to its present owner." (*De Luz Homes, supra*, 45 Cal.2d at pp. 566, 570.) In *Pacific Mutual Life*, this court rejected a "reproduction cost" approached which was based on the value of a building *to the taxpayer* as a "unique" monument-style corporate headquarters, and not what the hypothetical buyer of the building would pay for it considering its best and highest use in the

marketplace. (*Pacific Mutual Life, supra*, 187 Cal.App.3d at pp. 1148-1149.)[15] And in *Carlson v. Assessment Appeals Bd. I, supra*, 167 Cal.App.3d 1004, the court rejected an approach that took into account unique private restrictions to which the taxpayer had agreed when it purchased the property from a railroad. The underlying theme of these cases is that property tax appraisal is based on a hypothetical market transaction with a hypothetical buyer, not the taxpayer's peculiar benefits or predicaments unrelated to the market.

It makes no difference to the buyer whether the seller pays the costs of cleanup, or whether the seller *and* some third parties pay them. The fact of life is that environmental laws will require those costs to be expended on the property, and even if there is no "specific enforcement order." (See *Dominguez Energy v. County of Los Angeles* (1997) 56 Cal.App.4th 839, 854 [65 Cal.Rptr.2d 766] ["We hold that the existence of a specific enforcement order is not a prerequisite under section 402.1 to a taxpayer's showing that the land is subject to restrictions imposed by government which affect its value."].)[16]

It is thus inaccurate to think in terms of cleanup costs as being *offset* by third party contributions. The fallacy is, to take our cue from *De Luz Homes, Pacific Mutual Life*, and *Carlson*, looking at the seller's peculiar circumstances rather than the behavior of the hypothetical buyer. For example, in the present case, any number of equitable factors wholly extrinsic to the value of the property could govern what a "PRP" or potentially responsible party in a CERCLA contribution action might pay. (See 42 U.S.C. § 9613(f)(1).) Only the seller is benefited by third party contributions, and that is because the *land* is *already* stuck with the cleanup costs.

As we mentioned above, a deal might be structured so that the buyer pays a nominally higher price for both land *and* contract rights (which is what Mola did in 1987 and what the taxpayer in *Sweepster* did in 1986), assuming deep pockets behind those contract rights, but the buyer in that case would be getting a distinct intangible apart from the property itself—rather like a house that burned down just before the lien date in a situation where the taxpayer had a contract right to have an insurer replace it. The property

---

[15]*Pacific Mutual Life* also nicely illustrates the principle that the concept of best and highest use is pegged to the kind of use a hypothetical buyer in the marketplace would contemplate, not the unique circumstances of the taxpayer.

[16]Section 402.1, subdivision (a)(6) requires assessors to take into account "[e]nvironmental constraints applied to the use of land pursuant to provisions of statutes." While the "take into account" language certainly does not, in itself, mandate a cost-of-cure deduction approach, it is certainly not inconsistent with it. (This language was added by a 1974 amendment.)

would necessarily have to be valued taking into account the damage done by the fire. (§ 51, subd. (a)(2).) In the context of property known to be polluted as of the lien date, its value is what it would fetch on the open market, independent of the fortuities of what the taxpayer may, or may not, be able to recover from others by way of contribution for cleanup costs imposed by environmental law.[17]

## III. CONCLUSION

Again we stress that we only decide the case before us, which involves non-income-producing real property. Nor are we saying that simple present value cost-of-cure deduction from fair market value of nonincome producing land as if uncontaminated is the *only* way that the open market value of contaminated property may be approximated for property tax purposes. Adequate comparables of *contaminated* property would certainly be another way, if an assessor could ever find any. But what we are saying is that, given that cost of cure was a good approximation (or "surrogate" as New York's high court put it) for open market value in the present case, it is an error to try to minimize that cost by adding back in contributions which taxpayer hoped to collect from third parties.

We may anticipate two gut-level objections to the approach adopted by the trial judge in this case and which we affirm today. The first is that deduction of cost of cure, even if confined to nonincome producing property, may tend to depress property tax valuations. There is nothing we can do about that, given the text of the Constitution and sections 51 and 110. If environmental cleanup laws have the unintended consequence of lowering the market value of commercial real property for tax assessment purposes,

---

[17]A final word on the *Sweepster* opinion is order. In the first part of *Sweepster*, the court rejected the taxpayer's contention that the tax tribunal should not have considered the indemnification provision in the purchase agreement with Chrysler. (See *Sweepster, supra,* 571 N.W.2d at p. 554.) The court later acknowledged that the indemnification agreement was "a clear intangible," but said it "unquestionably affects the value of the subject property because it relieves [the taxpayer] and its successors of the financial consequences of the contamination." (*Id.* at p. 555.)

For purposes of its value to California law, the *Sweepster* opinion is faulty mainly in this regard: It *included* the value of a clear intangible in the value of the real property, much as if a board included the value of a taxpayer's contract right to insurance proceeds in the value of a parcel of land on which a building had burned down just before the lien date. The correct approach is actually the opposite, given our Constitution's mandate to value just the property. The value of the intangible *was* relevant in *Sweepster, but* in establishing the open market value of the *property* when Chrysler sold it to the taxpayer. To repeat: Chrysler did not get $3.5 million for its property in *Sweepster*, it got much less. Prudential did not get $46 million here; it also had to *give* an intangible which effectively reduced the actual selling price.

then that is what they do, for better or worse. The Constitution and the Revenue and Taxation Code peg valuations to the market.

The second gut-level reaction is that the taxpayer should not receive the benefit of an *intangible* thrown in by an earlier seller of the property, such as an indemnification agreement, while not having to somehow "pay" for that benefit in the property tax valuation. But that is also the result of the fact that we are only dealing with real property tax valuations. If you buy real property plus an intangible, you are only taxed on the value of the property. (See § 212, subd. (c) ["Intangible assets and rights are exempt from taxation . . . ."].) And that really isn't so unfair after all: Here, Mola didn't really pay $46 million, and Prudential didn't really receive $46 million, when the property changed hands in 1987.

The trial judge was thus correct in concluding that the board used an invalid methodology. That methodology does not reflect the market. The judgment is affirmed, and costs awarded to the respondent taxpayer.

Crosby, J., and Rylaarsdam, J., concurred.